UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————X

OLIVER WRIGHT,

                Petitioner,

      -against-

ISRAEL RIVERA, Superintendent,
Coxsackie Correctional Facility,

               Respondent.

—————————————————————————X

**OPINION & ORDER
CV-06-1725 (SJF) (MDG)**

FEUERSTEIN, J.

On January 3, 2001, a judgment of conviction was entered against petitioner Oliver Wright (petitioner) in the Supreme Court of the State of New York, Kings County (Marrus, J.), upon a jury verdict finding him guilty of four (4) counts of rape in the first degree (N.Y. Penal Law § 130.35[1]) and imposition of sentence. On April 7, 2006, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth herein, the petition is denied and the proceeding is dismissed.

I.      BACKGROUND

      A.     Factual Background

The following facts were taken from the trial transcript (T.) and sentencing minutes (S.):

          1.     <u>The People's Case</u>

Natoya Stephens ("Natoya") testified that at the time of trial she was seventeen (17) years old. (T. 35). At that time, she lived on East 92nd Street in Brooklyn, New York with her father, Delroy Stephens ("Delroy"), her stepmother, Nella Stephens ("Nella"), her sister, Sashagay, who

was thirteen (13) years old, and her sister, Akella, who was seven (7) months old. (T. 35).

Calesha Wright ("Calesha") testified that at the time of trial she was sixteen (16) years old and lived on Long Island, New York. (T. 134). At that time, she lived with her father, Rohan Wright ("Rohan"), her stepmother, Joanne McCloud ("Joanne"), and her sister, Kimberlyn Wright ("Kimberlyn"), who was fourteen (14) years old. (T. 134-135).

Natoya and Calesha testified that they were first cousins, and that petitioner was their uncle. (T. 35, 38, 134, 136). Rohan testified that petitioner was his younger brother. (T. 189-190).

Natoya and Calesha testified that between March 1999 and June 30, 1999, they lived together at 2121 Westberry Court, Apartment 6H, in Brooklyn, New York. (T. 36, 69-70, 135). They testified that during this period, the following ten (10) people lived with them in Apartment 6H: Delroy; Rohan; Sashagay; Kimberlyn; two (2) cousins, Shameka, who was twelve (12) years old at the time of trial, and Dennis, who was fourteen (14) years old at the time of trial; and four (4) uncles, Nigel Stephens ("Nigel"), Trevor Donald ("Trevor"), Wayne a/k/a Nicholas Clark ("Wayne"), and petitioner. (T. 36, 38, 40-41, 134-137, 190-191). Natoya, Calesha, and Rohan testified that petitioner had two (2) young children, Tiffany a/k/a Stephanie ("Stephanie") and Cheyenne a/k/a O.J. ("O.J."), who visited the apartment on the weekends and sometimes during the week. (T. 116, 141-142, 158-159, 199-200).

Natoya testified that Apartment 6H was on the top floor of a six (6)-story building, and that there were apartments on either side of Apartment 6H. (T. 84). The apartment had five (5) bedrooms, a kitchen, three (3) bathrooms, a livingroom, and a hallway. (T. 38). Calesha and Rohan testified that the two (2) of them shared a bedroom with Kimberlyn and Shameka. (T.

2

137, 163, 191). Natoya testified that she and Sashagay shared a bedroom that was adjacent to the kitchen and that petitioner had his own bedroom. (T. 40-41, 86-87).

Natoya and Calesha testified that they attended Canarsie High School and that, except on the nights on which Natoya attended night school, they usually came home from school together and arrived home sometime between 2:45 p.m. and shortly after 3:00 p.m. (T. 44-45, 76, 138-139, 160-161). Although Natoya testified that she sometimes came home from school before Calesha, (T. 44), Calesha testified that she was always the first child to arrive at the apartment after school and that on the days Natoya attended night school, she would arrive home without Natoya between 2:45 p.m. and shortly after 3:00 p.m. (T. 139, 160-161).

Calesha and Natoya testified that the remaining children in the household went to elementary school or junior high school, which released at 3:00 p.m. (T. 45, 76-77, 139, 161). Sashagay, Kimberlyn, and Shameka usually traveled home by city bus and arrived home between 4:00 and 5:00 p.m. (T. 45, 74-78, 140, 161-162). Calesha testified that Dennis usually "stayed outside" and "wouldn't really come home" after school. (T. 162).

Natoya and Calesha testified that all of their uncles, except petitioner, usually worked during the day. (T. 45, 71-72, 140, 159). Natoya, Calesha, and Rohan testified that petitioner was unemployed and was usually home. (T. 45, 75, 140-141, 193). Calesha testified that Nigel worked and was never home in the late afternoon. (T. 141, 159). However, Natoya testified that sometimes Nigel would be at home in the afternoon, and that he "came and went" from the apartment. (T. 72). Rohan testified that his, Wayne's, and Delroy's shifts rotated between day work and night work and that Nigel never worked. (T. 191-192). Rohan further testified that he and Nigel were sometimes at home during the day, and that Nigel came and went from the

3

apartment without any particular schedule. (T. 192-193, 200).

Natoya testified that after school one day, sometime between March 1, 1999 and April 30, 1999, petitioner entered her room when no one else was home. (T. 42-44, 75-76, 83, 89). According to Natoya, petitioner was shirtless and was wearing pajama bottoms. (T. 42, 79). At the time, she had been home for about an hour, and was "lying on [her] bed" in her room, watching television in a short-sleeved t-shirt and shorts. (T. 43-44, 76). Natoya testified that petitioner told her that he "just wanted one [(1)] minute" of her time, and she "told him no." (T. 42, 78). She testified that petitioner "laid [Natoya] down the bed and he, he held [her] hands back . . . behind [her] head with one [(1)] hand and his next hand he was using to take [her] clothes off." (T. 42). Natoya testified that she hit and slapped petitioner, screamed, and begged him to stop. (T. 42-43, 78-80). According to Natoya, nobody in the apartment building heard her screaming, came to the door, or called the police. (T. 85). Natoya further testified that, while holding her wrists with one (1) hand, petitioner tried to remove her clothing with his other hand. (T. 42-43, 78-82). She testified that when petitioner could not remove her clothing, he pulled her shorts and underpants over to the side. (T. 42-43, 82-83). According to Natoya, petitioner took out his penis through the hole in the front of his pajama bottoms and, without putting on a condom, forced his penis into her vagina. (T. 42, 44). She testified that she cried and told petitioner that he was hurting her and that petitioner said that he was not hurting her, repeating that he just wanted one (1) minute. (T. 42-43, 98). According to Natoya, "when [petitioner] was finished, he just [got] up and left [her] room and he told [her] not to tell anybody." (T. 43). Natoya testified that afterward, she stayed on her bed and cried, and then showered. (T. 44).

Natoya testified under cross-examination that her "shorts and [her] panties were a little

4

stretched out by [petitioner] pulling them by the side." (T. 83). However, she did not preserve these clothes to show them to the police. (T. 81). According to Natoya, she had no scratches, cuts, or bruises, but her vagina hurt from the incident. (T. 81, 98-99).

Natoya testified that, at first, she did not confide in anyone, and did not seek medical attention because she was "ashamed," and "scared of what they might think, or how they'[d] judge [her] by what happened." (T. 46, 99). Upon cross-examination, Natoya testified that, for some time, she did not come home alone. (T. 94-95).

Calesha testified that one afternoon between May 1, 1999 and May 30, 1999, when she and petitioner were home alone, petitioner entered her room, where she had been doing her homework on the couch. (T. 142-143, 146, 164). According to Calesha, petitioner was shirtless and was wearing boxer shorts. (T. 143). She testified that he had grease in his hands and that he asked Calesha to grease his hair. (T. 142-143, 165). Calesha testified that she began greasing petitioner's hair and that, as she did so, petitioner began "feeling up [her] leg . . . on [her] chest and [her] vagina" with "his hands." (T. 142-143, 166). Calesha testified that she told petitioner to stop, but that he did not stop. (T. 142-143). She further testified that petitioner removed the bottom of her clothing, which consisted of either shorts or pajamas, and that she tried to fight him off by hitting him on his arms, but he was too strong for her. (T. 142, 144-145, 167). She testified that petitioner held her arms down, forced her legs apart, and "inserted his penis into [her] vagina" while not wearing a condom. (T. 142, 144-145, 166-169). After the incident, petitioner left the room and Calesha took a shower. (T. 145). Calesha testified that she was "scared" and "felt ashamed" and that she did not immediately tell anyone what had happened. (T. 146).

Natoya and Calesha each testified that a few weeks later, Calesha saw Natoya crying in the kitchen. (T. 46-47, 90, 146, 171, 183). When Calesha asked what was wrong, Natoya told her that petitioner had raped her. (T. 46-47, 100, 146, 171). Calesha told Natoya that the same thing had happened to her. (T. 47, 100, 146, 171). They testified that they decided not to tell anybody, opting, instead, to speak directly with petitioner. (T. 47, 146). Calesha initially testified that they chose to speak with petitioner after this, their first discussion. (T. 175-176). However, she later testified that they reached this decision during a second discussion. (T. 184-185).

Natoya and Calesha testified that they went together to petitioner's bedroom and told him to stop what he was doing to them and that petitioner agreed to stop. (T. 47-48, 91, 100, 147, 177).

Calesha testified that later in May 1999, she was again in the apartment alone with petitioner. (T. 147-148, 173, 183-184). She had changed into her pajamas after school, and was laying on the couch in her room, watching television. (T. 147-149, 167). Petitioner entered her room, shirtless and wearing boxer shorts. (T. 173-174). She testified that petitioner began "feeling on [her] legs and on [her] chest and on [her] vagina." (T. 148, 173-174). She told petitioner to stop, tried to push him off, and hit his chest and arms, but petitioner removed her pajama bottoms and, without wearing a condom, inserted his penis into her vagina. (T. 148-149, 174). Calesha testified that, after this incident, she felt scared and ashamed and did not confide in anyone that day. (T. 149, 184).

Calesha's father, Rohan, testified that during this time period, when he would mention to Calesha that she was not keeping the apartment clean, she would begin crying. (T. 193-194). He testified that Calesha would also sometimes ask him when they were going to move. (T. 194).

6

Natoya testified that on June 1, 1999, she stayed home from school because she "was throwing up" and "wasn't feeling good." (T. 48, 59, 95, 97). She testified that she thought that she was sick because she "drank some soda that [she] left over[night] on the table." (T. 48, 59, 95). Natoya testified that she was in bed in her nightgown when petitioner, who was the only other person in the apartment, entered her room shirtless and wearing pajama bottoms. (T. 49). She testified that petitioner was manipulating his exposed penis with his hand, and that he "told [her] to open [her] legs so he could see [her] vagina so he could jerk off." (T. 49). She testified that she told petitioner to leave her alone, but petitioner approached her bed and asked her to have sex with him. (T. 49-50). She testified that when she refused, petitioner held her hands up toward her shoulders, used his legs to twist her legs apart, and got on top of her. (T. 50). Natoya testified that she screamed, tried to kick petitioner and told petitioner to get off of her. (T. 50, 97). According to Natoya, petitioner let go of her hands, pulled her underpants to the side, and forced his penis into her vagina without using a condom. (T. 50-51). She testified that afterward, petitioner arose and left without speaking. (T. 51).

Natoya and Calesha testified that when Calesha came home from school that day, she saw Natoya crying in her bed. (T. 52, 176). Natoya told Calesha what had happened and Calesha responded that petitioner had done the same thing to her again. (T. 52, 150, 176, 184-185). Natoya and Calesha testified that they did not know what to do, or who to tell. (T. 52, 101).

Natoya testified that sometime between June 1, 1999 and June 30, 1999, she was in the kitchen helping her uncle Wayne cook dinner when Wayne left to buy more groceries, leaving her at home alone with petitioner. (T. 54, 103-104). Natoya testified that petitioner entered the kitchen and asked Natoya "to bend over so he could put his penis in [her] vagina." (T. 54-55).

7

She testified that petitioner held her by her waist and bent her over. (T. 54-55). According to Natoya, petitioner then thought he heard somebody at the door and went to see if Wayne had returned. (T. 55). Natoya ran to her bedroom and locked herself inside. (T. 55-56, 86-87, 105). She testified that petitioner knocked on her bedroom door and asked her to open it, saying that he would not hurt her. (T. 56). According to Natoya, she stayed in her room until Wayne returned, but she did not tell Wayne what had happened. (T. 56, 105).

Calesha testified that in July 1999, she got a summer job working where Natoya's father, Delroy, worked. (T. 151). One evening, riding on the train home from work with Delroy, she told him what petitioner had done to her. (T. 149-151, 178-179). Delroy told her that she should tell her father, Rohan. (T. 150, 152, 179).

Calesha testified that she soon told Rohan what petitioner had done to her, as well as what Natoya said that petitioner had done to Natoya. (T. 152-153, 179). According to Calesha, Rohan telephoned Natoya and asked her what had occurred between Natoya and petitioner. (T. 153, 179). Calesha testified that when Natoya told Rohan what had happened, Rohan said that Natoya should tell Delroy, and that if Natoya did not tell him, then Rohan would. (T. 153, 179).

Natoya testified that during the first week of July 1999, Natoya and her immediate family moved to 1224 East 92nd Street. (T. 110). She testified that one (1) or two (2) weeks after the move, Natoya went jogging past 2121 Westberry Court with her stepmother, Nella. (T. 57, 118-119). According to Natoya, when Nella asked her "why [she] looked like that," she told Nella what Calesha said that petitioner had done to Calesha. (T. 57, 114, 118-119). On cross-examination, Natoya testified that she told Nella because she had been "dreaming that he [was] on top of [her]," and because she felt that she "needed counseling." (T. 114). However, she did

not tell Nella about petitioner and herself until later that night. (T. 57). She testified that when she did so, Nella told Natoya's grandmother, Eva Adkins-Wright ("Eva"). (T. 57).

Natoya, Calesha, Rohan, and Eva testified that Eva called a family meeting that night at 2121 Westberry Court. (T. 57, 153, 195-196, 257). Natoya, Rohan, Eva, Calesha, Calesha's grandfather (Gifford Wright ("Gifford")), Nigel, Delroy, Nella, and petitioner all attended the meeting, at which Natoya and Calesha told everyone what had happened. (T. 57-58, 179-180, 196, 257, 263). Delroy, Nella, Eva, and Rohan took Natoya and Calesha to Brookdale Hospital Medical Center ("Brookdale Hospital") that night. (T. 58, 116-117, 153-154, 196, 218).

Doctor Allen Weiss, formerly the pediatric attending doctor at Brookdale Hospital, testified as an expert in the field of pediatrics. (T. 217-220). According to Doctor Weiss, Natoya and Calesha were treated at Brookdale Hospital on the afternoon of August 4, 1999. (T. 59, 114-115, 221-222). Doctor Weiss testified that he was the pediatric attendant in the emergency room that afternoon. (T. 221). Dr. Weiss testified that the gynecological examinations of Natoya and Calesha revealed no vaginal injury or trauma. (T. 222-223). However, Dr. Weiss also testified that during his career, he had observed vaginal trauma in less than ten percent (10%) of all adolescent patients complaining of sexual assault. (T. 223-224).

Dr. Weiss further testified that Natoya underwent a urine pregnancy test, and that she returned for a follow-up visit when the results had returned. (T. 228-229). According to Doctor Weiss, the record from Natoya's August 11, 1999 follow-up visit indicated that Natoya was approximately twenty (20) weeks pregnant at that time. (T. 229). Dr. Weiss testified that the record further indicated that Natoya had identified her last menstrual period as having occurred in April 1999. (T. 235-236). He testified that it could be concluded that Natoya would have missed

9

approximately three (3) menstrual periods by the time she visited Brookdale Hospital. (T. 235-236).

Natoya testified that, although she had occasionally missed her period between March 1999 and August 1999, she was unaware that she was pregnant because she "always miss[ed] her period," had "never [had] a regular period because [she] was anemic," and had spot bleeding during those months. (T. 59, 108-109, 114-115, 154-155).

Natoya testified that, after learning from the doctor that she was pregnant, she told her family that she thought petitioner might be the father of her baby. (T. 60). Natoya testified that she had a boyfriend, Terrence, with whom she was sexually active in the months during which petitioner had attacked her. (T. 61). According to Natoya, although Terrence used a condom when he and Natoya had sex, on one occasion the condom had broke. (T. 61-62, 108-110). However, she testified that she believed she had menstruated following that incident. (T. 108-110).

Natoya testified that after the family meeting and hospital visit, she moved to Newburgh, New York and lived with a friend of her family. (T. 63-65). Calesha testified that after these events, she moved to Long Island, New York with Rohan, Joanne and Kimberlyn. (T. 156-157, 195).

2.    The Defense

Petitioner's stepmother, Eva, testified that she had been married to petitioner's father, Gifford, for ten (10) years, and had known petitioner since he arrived in the United States at about age thirteen (13). (T. 263).

10

Eva testified that she was the mother of Natoya's father, Delroy, and the stepmother of Calesha's father, Rohan, and that she had known both Natoya and Calesha since they arrived in the United States in 1996 and had lived with them for about two (2) years. (T. 248-249). Eva testified that in the fall of 1998, Natoya moved out of Eva's home and into 2121 Westberry Court. (T. 250-251). About three (3) months later, Calesha moved into 2121 Westberry Court. (T. 251). Eva continued to have contact with both Natoya and Calesha after they moved out of her home. (T. 252).

Eva testified that at the August 1999 family meeting at 2121 Westberry Court, she noticed that Natoya was getting "stout" around the waist. (T. 257, 259). According to Eva, Natoya stated at that meeting that she had "lost her period" and when Eva asked Natoya who the father was, Natoya said that petitioner was the father. (T. 257).

Between March 1999 and July 1999, Eva often stopped by 2121 Westberry Court to visit with her grandchildren and saw that petitioner's children, O.J. and Stephanie, usually stayed with petitioner there. (T. 254, 260, 262). Eva testified that the mother of petitioner's children, Sharon Pope ("Sharon"), lived elsewhere, and that the children sometimes stayed with Sharon on her days off from work. (T. 254-255, 261-262). Eva testified that Sharon worked on some weekdays and every other weekend. (T. 261). During the spring of 1999, Eva picked up Sharon from 2121 Westberry Court every day at 2:00 p.m. and brought Sharon to work. (T. 255-256). O.J. was always at the apartment when Eva arrived and Stephanie was in school during that time. (T. 255-256).

Petitioner testified that O.J. came to live with him at the end of February 1999 or the beginning of March 1999 and that Stephanie came to live with him one (1) or two (2) weeks

11

later. (T. 267-268, 273). According to petitioner, he and Sharon shared the job of taking Stephanie to school and he picked Stephanie up after school. (T. 273). His children usually slept in his room when they stayed at 2121 Westberry Court. (T. 274).

On cross-examination, petitioner admitted that he occasionally walked around the house shirtless and wearing boxer shorts and that he had pictures of "calendar ladies" displayed in "panties and bras" in his bedroom. (T. 275-277). Petitioner further admitted that his children were exposed to those pictures. (T. 276). However, petitioner testified that his children had moved into 2121 Westberry Court in an "emergency," allowing him no time to remove these pictures or to "dress" his room the way it was "supposed to be." (T. 276).

Petitioner testified that during the spring of 1999, Rohan had a night job at Toys "R" Us and also occasionally worked construction jobs during the daytime, but that Rohan was generally home during the day. (T. 267-269). Petitioner testified that Wayne's work rotated between day and night shifts and that Nigel was in and out of the apartment during the day and may have been working night shifts at Toys "R" Us during this time period. (T. 267-269). Petitioner testified that Nigel's son, Dennis, was generally the first child home from school and that because of the number of people living in the apartment, petitioner was never home alone with either Natoya or Calesha. (T. 280-281, 291).

Petitioner testified that at the August 1999 family meeting at 2121 Westberry Court, Natoya said that petitioner had raped and impregnated her, but he denied doing the things of which Natoya and Calesha accused him. (T. 270-272). Petitioner also testified that he had never touched Natoya and Calesha. (T. 270-271).

Nigel testified that during the spring and summer of 1999, he was doing construction

work across the road from 2121 Westberry Court and that he worked there daily from 8:00 a.m. to between 2:00 p.m. and 4:00 p.m. (T. 295-301). He testified that he went into Apartment 6H during the day to eat and to use the bathroom. (T. 297-298, 301). According to Nigel, his son, Dennis, was the first child to come home from school each day because his school was closest to 2121 Westberry Court. (T. 298-299). Dennis's school released Dennis at 3:00 p.m. and Nigel saw him arrive home every single day. (T. 301).

Petitioner testified that he moved from 2121 Westberry Court to 5 Parkside Court, Brooklyn, New York, after he was released on bail in October 1999 or November 1999. (T. 265-266, 271).

### 3.     The Stipulations

The parties stipulated that if Detective Claude Kellman ("Detective Kellman") were called to testify, he would have said that on August 15, 1999, he interviewed Natoya in her home and observed Natoya to be pregnant, but that she was just beginning to show. (T. 214). Detective Kellman would also have testified that petitioner said his birthday was August 31, 1973 and that he was Natoya and Calesha's uncle. (T. 214-215).

The parties also stipulated that Natoya gave birth to her baby on December 26, 1999 and that a DNA test established that petitioner was not the biological father of Natoya's child. (T. 316).

### 4.     Verdict and Sentence

On December 13, 2000, the jury found petitioner guilty of four (4) counts of rape in the first degree, and not guilty of one (1) count of attempted rape in the first degree. (T. 404-407).

13

Prior to sentencing, defense counsel moved to set aside the verdict as against the weight of the evidence. (S. 2). The trial court denied that application. (S. 2).

On January 3, 2001, a judgment of conviction was entered against petitioner in the Supreme Court, Kings County (Marrus, J.), upon a jury verdict finding petitioner guilty of rape in the first degree (four [4] counts) and imposition of sentence of a determinate term of imprisonment of eight (8) years for each of the four (4) counts of first-degree rape. (S. 15). The court ordered the sentence on the two (2) counts relating to Natoya to run concurrently to each other, the sentence on the two (2) counts relating to Calesha to run concurrently to each other, and the sentence on the counts relating to each complainant to run consecutively, for an aggregate term of imprisonment of sixteen (16) years. (S. 15).

B.    Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*, that: (1) the trial court violated his Antommarchi rights when it required him to choose between waiving participation in bench and sidebar conferences and requiring all prospective jurors to speak in open court during voir dire; (2) the evidence was legally insufficient; (3) the verdict was against the weight of the evidence; (4) petitioner was denied the effective assistance of counsel; (5) the sentence imposed was excessive; (6) the prosecutor's cross-examination of petitioner was improper and unduly prejudicial; and (7) the prosecutor's summation was prejudicial and denied petitioner a fair trial. On June 14, 2004, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*, that (1) the trial court did not violate petitioner's

14

Antommarchi rights because there is no requirement that the court interview any jurors in private or at the sidebar; (2) petitioner's challenge to the legal sufficiency of the evidence was unpreserved and, in any event, was without merit; (3) the verdict was not against the weight of the evidence; (4) petitioner received meaningful representation at trial; (5) the sentence imposed was not excessive; and (6) petitioner's remaining contentions lacked merit. People v. Wright, 8 A.D.3d 507, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004). On August 16, 2004, the New York Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Wright, 3 N.Y.3d 683, 784 N.Y.S.2d 21, 817 N.E.2d 839 (2004).

Petitioner filed an application for a writ of error coram nobis to vacate the Appellate Division's June 14, 2004 order affirming petitioner's judgment of conviction on the ground of ineffective assistance of appellate counsel on September 16, 2005. By order dated December 12, 2005, the Appellate Division, Second Department, denied petitioner's application for a writ of error coram nobis, finding that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. People v. Wright, 24 A.D.3d 576, 577, 805 N.Y.S.2d 296 (N.Y. App.Div. 2005). On March 31, 2006, the New York Court of Appeals denied leave to appeal the December 12, 2005 order of the Appellate Division. People v. Wright, 6 N.Y.3d 840, 814 N.Y.S.2d 88, 847 N.E.2d 385 (2006).

On or about April 7, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that (1) the evidence was legally insufficient; (2) petitioner's waiver of his Antommarchi rights was invalid; (3) the prosecutor's cross-examination of petitioner was improper and unduly prejudicial; (4) the prosecutor's summation was prejudicial and denied petitioner a fair trial; (5) the verdict was against the weight of the

evidence; (6) the sentence imposed was excessive; (7) petitioner was denied the effective assistance of trial counsel; and (8) petitioner was denied the effective assistance of appellate counsel. Respondent filed his return on September 18, 2006.

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   Exhaustion

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. The AEDPA requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner "exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the applicant.'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808 (2d Cir. 2000) (insertions in original). The exhaustion requirement mandates that a petitioner "fairly present" both the factual and legal premises of his federal claim to the highest state court. See, Baldwin v. Reese, 541 U.S. 27, 32-34, 124 S.Ct. 1347, 158 L.Ed. 2d 64 (2004); see also, McKinney v. Artuz, 326 F.3d 87, 96-97 (2d Cir. 2003) ("To exhaust, the petitioner must 'fairly present' his or her federal claims to the state courts, meaning that he or she must put before the appropriate state court 'all of the essential factual allegations' and 'essentially the same legal doctrine' asserted in the federal petition.") (citation omitted).

It is undisputed that all of the claims raised by petitioner in his habeas petition were exhausted in state court.

## 2. Procedural Bar

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

If a state court denies a claim pursuant to a state procedural rule, then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See, Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); see also, Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("[W]hen a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.").

The Appellate Division denied petitioner's legal sufficiency claim on an independent and adequate state law procedural ground, i.e., that petitioner's legal sufficiency claim was not preserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2). People v. Wright, 8 A.D.3d 507, 507-508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004). The Appellate Division's holding, in the alternative, that the claim was, in any event, without merit, does not cure the procedural default. Petitioner has not demonstrated that there was cause for his default, that the alleged violation of federal law will result in actual prejudice, or that the court's failure to review his legal sufficiency claim will result in a fundamental miscarriage of justice. Petition for Writ of Habeas

Corpus at 14-16, <u>Wright v. Rivera</u>, No. CV-06-1725 (E.D.N.Y. <u>appeal docketed</u> Apr. 7, 2006). Thus, petitioner is foreclosed from raising his legal insufficiency claim on federal habeas corpus review.

### 3. Standard of Review

Under the AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits"[1] in state court only if the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause [of 28 U.S.C. § 2254(d)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (alterations added); <u>see also</u>, 28 U.S.C.§ 2254(d)(1). "Under the 'unreasonable application' clause [of 28 U.S.C. § 2254(d)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

---

[1] "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" <u>Bell v. Miller</u>, 500 F.3d 149, 155 (2d Cir. 2007) (quoting <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001)); <u>see also</u>, <u>Spears v. Greiner</u>, 459 F.3d 200, 203 (2d Cir. 2006).

<u>Williams</u>, 529 U.S. at 413, 120 S.Ct. 1495 (alterations added); <u>see also</u>, 28 U.S.C. § 2254(d)(1).

A federal court "may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law erroneously

or incorrectly. Rather, that application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411,

120 S.Ct. 1495; <u>see also</u>, <u>Gilchrist v. O'Keefe</u>, 260 F.3d 87, 93 (2d Cir. 2001).

A state court's determination of the factual issues "shall be presumed to be correct," and

the applicant "shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence." 28 U.S.C. § 2254(e)(1).

### B.    Voir Dire

Petitioner argues that the trial court violated his <u>Antommarchi</u> rights when it gave him the

option of waiving his presence at sidebars with prospective jurors or requiring that jurors speak

in open court. Petition for Writ of Habeas Corpus at 24-26, <u>Wright v. Rivera</u>, No. CV-06-1725

(E.D.N.Y. <u>appeal docketed</u> Apr. 7, 2006). <u>See</u>, <u>People v. Antommarchi</u>, 80 N.Y.2d 247, 590

N.Y.S.2d 33, 604 N.E.2d 95 (1992).

"A criminal defendant has a federal constitutional right, under the Confrontation Clause

of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments,

to be present at all stages of the trial where his absence might frustrate the fairness of the

proceedings." <u>Sanchez v. Duncan</u>, 282 F.3d 78, 81 (2d Cir. 2002) (internal quotation marks

omitted). The impaneling of the jury is one such stage. <u>Sanchez</u>, 282 F.3d at 81. However, under

federal law, the constitutional right to be present at one's own trial is waivable. <u>U.S. v. Gagnon</u>,

470 U.S. 522, 529, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); <u>Clark v. Stinson</u>, 214 F.3d 315, 323

(2d Cir. 2000). A defendant's presence at trial is required only "to the extent that a fair and just hearing would be thwarted by his absence." Clark, 214 F.3d at 323 (quoting Snyder v. Massachusetts, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934)) (internal quotation marks omitted). A defendant's absence from a proceeding is reversible error "only where it would have a 'relation, reasonably substantial, to his opportunity to defend.'" Clark, 214 F.3d 315, 323 (2d Cir. 2000) (quoting Snyder, 291 U.S. at 105-06, 54 S.Ct. 330).

In determining whether reversible error has occurred at, or in relation to, a criminal proceeding, federal law distinguishes between two (2) kinds of constitutional errors: "trial errors" and "structural defects." United States v. Feliciano, 223 F.3d 102, 111 (2d Cir. 2000). "Trial errors" are of "relatively limited scope" and "are subject to harmless error review," while "structural defects" require "reversal of an appealed conviction because they 'affect [ ] the framework within which the trial proceeds.'" Feliciano, 223 F.3d at 111 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)) (deletion in original). "Errors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice." Feliciano, 223 F.3d at 111 (2d Cir. 2000) (quoting Yarborough v. Keane, 101 F.3d 894, 897 (2d Cir.1996)).

Prior to the voir dire proceedings, the trial court asked petitioner's trial counsel to explain petitioner's Antommarchi rights to him. (Voir Dire Proceedings [P.] 86). Petitioner's trial counsel explained to petitioner his right to be present during the voir dire proceeding. (P. 86). The trial court also explained to petitioner the potential impact of petitioner's failure to waive this right and asked him if he waived it. (P. 86-87). The following colloquy ensued:

| [Court]: | Now, I will not allow the juror to speak to me privately unless you say it's okay. If you say it's okay, the way we work it is a juror comes up to the bench, the DAs will walk up here to hear what the juror says and then your attorney will come back and tell you what happened at the bench; is that okay with you, or do you want to tell the jurors you have to speak publicly; is it okay with you, if the jurors ask to speak to me privately, that I speak to them privately without you hearing it? |
|---|---|
| [Defendant]: | Yes, sir. |

(P. 87). Thus, petitioner's waiver of his right to be present during part of the voir dire proceeding was knowing and voluntary. See, Clark, 214 F.3d at 323 (finding that a defendant can expressly waive the right to be present if his relinquishment is knowing and voluntary).

Assuming, arguendo, that there was error in the trial court's actions relating to petitioner's waiver of this right, the framework of the trial remained unaffected. See, Feliciano, 223 F.3d at 112 (2d Cir. 2000) (holding that any alleged error of the district court was not a structural error that affected the framework within which the trial proceeded, and therefore no automatic reversal was required, where (1) the defendants were present in the courtroom for the entire jury selection process; (2) most of the questions were answered by the jurors in open court; (3) the defendants' counsel participated in the bench conferences and the defendants had the opportunity to consult with their counsel at any time during the limited bench questioning; and (4) only two (2) potential jurors who came to the bench for a sidebar conference were selected to serve on the jury); Sanchez, 282 F.3d at 82-83 (holding that there was no structural error requiring automatic reversal upon a habeas corpus petition where the defendant was present in the courtroom for the entire jury selection process, and where, of the nine (9) prospective jurors who attended bench conferences during the voir dire proceeding, none actually served on the

jury). Petitioner was present in the courtroom for the entire jury selection process. (P. 91-198). The jurors answered all but a few of the questions in open court. (P. 91-198). The trial court did not curtail petitioner's abilities to speak with his counsel about the limited bench inquiries, or to propose questions to the venire persons who came to the bench. (P. 91-198). Petitioner was also present for the peremptory challenge process, which the trial court conducted in open court. (P. 91-198). In addition, there were only three (3) instances in which jurors requested private conferences with the trial court and in each of those instances, the trial court excused the juror. (P. 130-133, 154-155). Thus, no juror who attended a bench conference during the voir dire proceeding actually served on petitioner's jury, (P. 91-198), there were no structural defects that affected the framework within which the trial proceeded, and the fairness of the proceeding was not frustrated by petitioner's absence. See, Sanchez, 282 F.3d at 81-83; Feliciano, 223 F.3d at 111.

The Appellate Division found that petitioner's Antommarchi rights were not violated because "[t]here is no requirement that the court interview any jurors in private or at the sidebar." People v. Wright, 8 A.D.3d 507, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004). Based upon the foregoing, the Appellate Division's conclusion is not contrary to, and does not involve an unreasonable application of, clearly established federal law. See, 28 U.S.C. § 2254(d). Nor has plaintiff demonstrated that the Appellate Division's decision was based on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted with respect to petitioner's claim that the trial court violated his right to be present during the voir dire proceeding.

22

C.    Improper Cross-Examination

Petitioner argues that the prosecutor improperly and with undue prejudice cross-examined petitioner concerning the photographic evidence found in petitioner's room. Petition for Writ of Habeas Corpus at 6-9, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). The Appellate Division found petitioner's claim of improper and unduly prejudicial cross-examination meritless. People v. Wright, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004).

Generally, evidentiary issues do not present federal constitutional issues. "In order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). When evidence is erroneously admitted, the test for determining whether the court denied defendant a fair trial is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been crucial, critical, highly significant." Collins, 755 F.2d at 19 (internal quotation marks omitted).

Assuming, arguendo, that the trial court erroneously admitted testimony regarding the photographs in petitioner's room, there was still sufficient evidence to form the basis of a conviction. See, Collins, 755 F.2d at 19. At trial, two (2) victims testified that petitioner had forcibly raped them. (T. 42-99, 142-184). See, People v. Jackson, 8 N.Y.3d 869, 870, 832 N.Y.S.2d 477, 864 N.E.2d 607 (2007) (noting that, in New York, the testimony of a single

23

witness, without corroboration, is sufficient to support a rape conviction); see also, People v. Arroyo, 54 N.Y.2d 567, 578, 446 N.Y.S.2d 910, 431 N.E.2d 271 (1982). In addition, the challenged evidence was not significant as corroboration because it did not directly attribute the charged crime to petitioner. See, Collins, 755 F.2d at 19-20 (finding no denial of a fundamentally fair trial where the properly admitted evidence included the "unwavering eyewitness testimony" of an individual witness, and where the erroneously admitted evidence was not significant as corroboration because it did not directly attribute the charged crime to the defendant). Thus, the trial court's admission of testimony regarding the photographic evidence found in petitioner's room was not crucial, critical, or highly significant.

Thus, the Appellate Division's determination that plaintiff's improper and unduly prejudicial cross-examination claim was without merit is not contrary to, and does not involve an unreasonable application of, clearly established federal law. See, 28 U.S.C. § 2254(d). Nor has plaintiff demonstrated that the Appellate Division's decision was based on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). As the trial court's admission of the evidence did not deny petitioner a fundamentally fair trial, habeas corpus relief is not warranted with respect to petitioner's claim of improper cross-examination.

D.    Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct, including the alleged errors of making inflammatory comments eliciting the sympathy of the jury, improperly disparaging petitioner and his trial counsel, acting as an unsworn witness, misstating the evidence, and

24

vouching for the credibility of the prosecution's witnesses. Petition for Writ of Habeas Corpus at 16-17, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). The Appellate Division determined that petitioner's prosecutorial misconduct claim lacked merit. People v. Wright, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004).

Generally, a prosecutor's comments will require reversal of a state court conviction only where the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted); see also, Donnelly v. DeChristoforo, 416 U.S. 637, 647-648, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (distinguishing between the ordinary trial error of a prosecutor and the sort of egregious misconduct that amounts to a denial of due process). To determine whether a prosecutor deprived a petitioner of a fair trial, a court must consider (1) the severity of the misconduct; (2) the measures adopted by the trial court to cure the misconduct; and (3) the certainty of a conviction absent the misconduct. See, Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).

Petitioner argues that the prosecutor engaged in misconduct during her summation when she "vouched for the credibility of the prosecution's witnesses"; characterized petitioner's keeping of photographs of women on his walls as "inappropriate behavior"; stated that petitioner chose his victims based on who was available; stated that some women cannot remember when they had their last menstrual period; and stated that her witnesses had nothing to gain from their testimonies. Petition for Writ of Habeas Corpus at 20-22, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 206). Petitioner also argues that the prosecutor "made inflammatory comments that were targeted at eliciting sympathy from the jury" by asking the

25

jury to "hold [petitioner] responsible for what he did to Natoya and to Calesha" and by depicting the complainants as persons deserving of sympathy. Petition for Writ of Habeas Corpus at 22-24, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 206). On several occasions, the trial court instructed the jury not to regard the prosecutor's comments as evidence. In his preliminary instructions, the trial court instructed the jury to "[k]eep in mind that the questions these attorneys ask during the trial will not be the evidence." (T. 6). During the charge, the trial court instructed the jury: "[Y]ou are not obligated to follow any of the arguments made by the attorneys in their summations." (T. 376). He then instructed the jury: "The only evidence upon which you must make your decision came from three [(3)] sources. First, you had the testimony that the witnesses gave; second, you had the physical exhibits which I allowed into evidence and, third, you had the stipulated or agreed upon facts by the attorneys. It is only on these three [(3)] sources of evidence that you must make your decision." (T. 377). Thus, the challenged comments by the prosecutor did not deny petitioner due process because the trial court emphasized to the jury that such comments were not evidence. See, Donnelly, 416 U.S. at 644, 94 S.Ct. 1868 (finding that a prosecutor's comments during summation did not deny a defendant due process where the trial judge emphasized to the jury that the prosecutor's argument was not evidence).

Petitioner next argues that the prosecutor improperly commented during her summation that defense counsel was "trying, again, to confuse the issues"of Natoya's pregnancy and the alleged rape. (T. 364); Petition for Writ of Habeas Corpus at 17, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). This comment did not constitute misconduct; rather, it was a legitimate response to defense counsel's summation, which raised the issues of

26

Natoya's pregnancy, the allegation of petitioner's fatherhood, and Natoya's credibility as a witness for the prosecution. (T. 330-333). See, Darden, 477 U.S. at 179, 106 S.Ct. 2464 (evaluating the prosecutor's comments in light of the defense arguments that preceded them); see also, United States v. Rivera, 971 F.2d 876, 883 (2d Cir. 1992) (prosecutor's remarks were legitimate responses to counsel's arguments, where the challenged statements were an attempt to focus the jury's attention upon the evidence and away from defense counsel's claims); United States v. McDermott, 918 F.2d 319 (2d Cir. 1990) (finding the challenged language "simply 'rebutting language suitable to the occasion'") (internal quotation marks omitted). Similarly, the prosecutor's implication that it was "absurd" for petitioner to state that for over four (4) months he was "never" alone with either Natoya or Calesha, (T. 369), was a legitimate response to defense counsel's summation argument that there was not likely a time in which petitioner and each complainant were alone in the house. (T. 323-327).

Petitioner also argues that the prosecutor acted as an unsworn witness when she stated, *inter alia*, that, "There were times, ladies and gentlemen, that he was the only one [(1)] in the house with Calesha and there were times, ladies and gentlemen, that he was in the house alone with Natoya. And to ask you to believe anything else would defy common sense. . . . It's absurd." (T. 371); Petition for Writ of Habeas Corpus at 18, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). The prosecutor made these comments after referring to the testimony of witnesses to the same effect, (T. 370-371), and it was not misconduct to use this testimony to call into question the contrary testimony of petitioner. See, Portuondo v. Agard, 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) ("[W]hen a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness. . .")

(internal quotation marks omitted) (alteration added).

Finally, petitioner claims that the prosecutor misstated the evidence when she said that "Calesha and Natoya told you that's exactly how they entered his room[ -] in boxers. He corroborates what they say." (T. 358) (alteration added); Petition for Writ of Habeas Corpus at 19, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 206). The remarks that petitioner quotes in his brief were introduced by the prosecutor with the statement that "another undisputed fact" was that petitioner "walk[ed] around in his boxer shorts." (T. 357). While Natoya did testify that petitioner wore pajama bottoms, (T. 42, 49, 79), Calesha testified that petitioner wore boxer shorts during both incidents relating to her, (T. 143, 173-174), and petitioner admitted under cross-examination that he sometimes walked around the house in boxer shorts. (T. 277). Thus, the prosecutor's comment that petitioner's testimony corroborated that of Calesha is accurate. More significantly, the fact that the prosecutor was attempting to emphasize with the challenged statement was the type of fly shared by the two (2) garments, "with the hole in the middle, like underwear," which might have shortened the length of time required for each rape. (T. 357-358). Natoya testified that petitioner took out his penis through the hole in the front of his pajama bottoms during his first attack on her. (T. 44). Thus, the testimony of petitioner was not entirely inconsistent with that of Natoya on the particular issue that the prosecutor was emphasizing and the prosecutor's misstatement was not sufficiently significant to have denied petitioner due process, given the emphasis and isolated nature of her comments and the fact that the trial court instructed the jury not to consider the comments evidence. See, Donnelly, 416 U.S. at 646, 94 S.Ct. 1868 ("The consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's

deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions.") (internal quotation marks omitted).

None of the challenged conduct rose to a level sufficient to have denied petitioner due process. See, Darden, 477 U.S. at 181-182, 106 S.Ct. 2464 (finding that no deprivation of a fair trial resulted from alleged prosecutorial misconduct where the prosecutor's comments did not manipulate or misstate evidence, or implicate the defendant's other constitutional rights, and where the trial court instructed the jurors that counsel's arguments were not evidence, and to base their decision on evidence alone); see also, Donnelly, 416 U.S. at 647-648, 94 S.Ct. 1868. None of the prosecutor's challenged conduct even warranted curative measures from the trial court and there was sufficient evidence to support a conviction absent the prosecutor's conduct. See, Bentley, 41 F.3d at 824. Thus, petitioner has not demonstrated that the Appellate Division's determination that his prosecutorial misconduct claim lacked merit, People v. Wright, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004), is contrary to, or an unreasonable application of clearly established federal law. See, 28 U.S.C. § 2254(d). Nor has petitioner demonstrated that the Appellate Division's finding resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted on petitioner's prosecutorial misconduct claim.

E.    Weight of the Evidence

Petitioner's claim that the verdict was against the weight of the evidence does not present

a federal constitutional issue. Petition for Writ of Habeas Corpus at 4-6, <u>Wright v. Rivera</u>, No. CV-06-1725 (E.D.N.Y. <u>appeal docketed</u> Apr. 7, 2006). <u>See</u>, <u>Correa v. Duncan</u>, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) ("[A 'weight of the evidence'] claim is distinct from an attack on a verdict based on the legal sufficiency of the evidence. A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles. . . . Accordingly, [federal courts are] precluded from considering the claim.") (alterations added); <u>see also</u>, <u>Rodriguez v. O'Keefe</u>, No. 96 Civ. 2094, 1996 WL 428164, at * 4 (S.D.N.Y. Jul. 31, 1996), <u>aff'd</u>, 122 F.3d 1057 (2d Cir. 1997) ("A claim that the verdict was against the weight of the evidence is not cognizable on habeas review."). Accordingly, this court is precluded from considering petitioner's "weight of the evidence" claim. <u>See</u>, 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the constitution or a federal law or treaty").

### F.  Excessive Sentence

Petitioner argues that the trial court abused its discretion by imposing a sentence that was excessive in light of the objectives of punishment. Petition for Writ of Habeas Corpus at 26-27, <u>Wright v. Rivera</u>, No. CV-06-1725 (E.D.N.Y. <u>appeal docketed</u> Apr. 7, 2006). The Appellate Division found this claim meritless. <u>People v. Wright</u>, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004).

To evaluate claims of excessive sentencing, the Supreme Court has articulated a principle of "gross proportionality," which finds unconstitutional under the Eighth Amendment only

extreme sentences that are grossly disproportionate to the crimes for which they are imposed. See, Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (the Eighth Amendment was not violated where a defendant was convicted of possessing more than six-hundred and fifty (650) grams of cocaine and where, without considering any mitigating factors, including the fact that the defendant had no prior felony convictions, the trial court sentenced him to a mandatory term of life imprisonment without the possibility of parole); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (the Eighth Amendment was violated where a defendant was convicted for uttering a one-hundred dollar ($100) "no account" check, a non-violent offense that carried a maximum punishment of five (5) years, but the defendant was sentenced to life imprisonment without parole under a state recidivist statute for his successive "relatively minor" offenses); and Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (the Eighth Amendment was not violated where a mandatory life sentence was imposed under state recidivist statute following a defendant's third felony conviction for obtaining one-hundred and twenty dollars and seventy-five cents [$120.75] by false pretenses, and where defendant had been previously convicted in state courts and sentenced to prison for felonies of the fraudulent use of a credit card to obtain eighty dollars [$80] worth of goods or services and the passing a twenty-eight dollars and thirty-six cents [$28.36] forged check).

Federal courts reviewing sentences imposed by state courts on habeas corpus review "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at 290, 103 S.Ct. 3001. The "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the

exceedingly rare and extreme case" and is reserved "for only the extraordinary case." Lockyer v.
Andrade, 538 U.S. 63, 73-77, 123, S.Ct. 1166, 155 L.Ed. 2d 144 (2003) (internal quotation
marks and citation omitted); see also, United States v. Snype, 441 F.3d 119, 152 (2d Cir. 2006)
(noting that successful challenges to the proportionality of particular sentences have been
exceedingly rare). In the Second Circuit, "[n]o federal constitutional issue is presented where . . .
the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383
(2d Cir. 1992); see also, United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991) (finding
that courts should review the disproportionality of sentences only in rare cases because the
legislature's fixing of terms for imprisonment is presumptively valid).

The sentence imposed upon petitioner was within the statutory range prescribed by N.Y.
Penal Law §§ 70.00 and 70.25. White, 969 F.2d at 1383; see also, N.Y. Penal Law §§ 70.00;
N.Y. Penal Law §§ 70.25; N.Y. Penal Law § 130.35[1]. Thus, the Appellate Division's
determination that plaintiff's sentence was not excessive, People v. Wright, 8 A.D.3d 507, 508,
778 N.Y.S.2d 693 (N.Y. App.Div. 2004), is not contrary to, and does not involve an
unreasonable application of, federal law. See, 28 U.S.C. § 2254(d); see also, Harmelin, 501 U.S.
957, 111 S.Ct. 2680; Solem, 463 U.S. 277, 103 S.Ct. 3001; Rummel, 445 U.S. 263, 100 S.Ct.
1133. Nor has plaintiff demonstrated that the Appellate Division based its decision on an
unreasonable determination of the facts in light of the evidence presented in the trial court
proceeding. See, 28 U.S.C. § 2254(d). Accordingly, petitioner's excessive sentence claim does
not warrant habeas corpus relief.


     G.     Ineffective Assistance of Trial Counsel

Petitioner claims that he was denied effective assistance of trial counsel, arguing that he was prejudiced when his trial counsel failed to object to the prosecutor's questioning of petitioner regarding photographs that petitioner kept in his room. Petition for Writ of Habeas Corpus at 9-14, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). The Appellate Division determined that petitioner was not denied the effective assistance of counsel. People v. Wright, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004).

In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable probability[2] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-694, 104 S.Ct. 2052, 80 L.Ed.2d (1984).

To prove a claim of ineffective assistance, a petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. As there are numerous ways to provide effective assistance in any given case, simple disagreements over trial strategies and tactics are insufficient to establish ineffectiveness. See, Strickland, 466 U.S. at 689, 104 S.Ct. 2052; see also, Henry v. Poole, 409 F.3d 48, 61 (2d Cir. 2005) ( "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' and even strategic choices made after less than complete investigation do not amount to ineffective assistance-so long as the known facts made it reasonable to believe that further investigation was

---

[2] A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d (1984).

unnecessary.") (quoting Strickland, 466 U.S. at 690-691, 104 S.Ct. 2052) (citation omitted) (alteration in original); Gluzman v. United States, 124 F.Supp.2d 171, 174 (S.D.N.Y. 2000) ("Among the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel are determinations regarding the defense strategy adopted at trial").

The Appellate Division found that trial counsel's presentation of a reasonable defense, interposition of appropriate objections, effective cross-examination of witnesses, and delivery of cogent opening and closing statements contributed to counsel's "meaningful representation"[3] of petitioner. People v. Wright, 8 A.D.3d 507, 508, 778 N.Y.S.2d 693 (N.Y. App.Div. 2004). Petitioner has not met his burden of overcoming the presumption that, under the circumstances, the failure of his trial counsel to object to the prosecution's use of the pornographic photographs constitutes an "omission[] . . . that 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)) (alteration added). Nor has petitioner pointed to any other defect in his trial counsel's work that fell below an objective standard of reasonableness in prevailing professional norms. See, e.g., Henry, 409 F.3d at 63-65 (finding that counsel's actions fell below an acceptable level of professional competence where he "[failed] to recognize the difference between the beginning and the end of the day" when eliciting and emphasizing an alibi) (alteration added).

---

[3] In evaluating ineffective assistance claims, New York courts apply a "flexible standard," the core of which is an inquiry into whether the defendant received "meaningful representation." People v. Benevento, 91 N.Y.2d 708, 712, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998). Though it appears that the Appellate Division used this standard rather than the federal standard in evaluating petitioner's claim, a state court decision can adjudicate a fairly-presented claim "on the merits" even if it does not discuss the claim or reference federal law. Sellan, 261 F.3d at 311-312.

Even if petitioner were to establish that his trial counsel's failure to object to the prosecutor's use of the pornographic photographs was unreasonable, petitioner has failed to establish that there is a reasonable probability that, but for this failure, the proceeding would have resulted differently. See, Strickland, 466 U.S. at 695-696, 104 S.Ct. 2052 (finding that, in determining the prejudice from counsel's errors, a court must consider the totality of the evidence before the judge or jury);[4] see also, United States v. Guang, 511 F.3d 110, 120 (2d Cir. 2007) (finding that trial counsel's failure to object to the admission of evidence did not prejudice the defendant, and thus did not constitute ineffective assistance, where the jury had sufficient evidence from which to find defendants' guilt without the admission of that evidence). A single victim's testimony is sufficient evidence to support a sexual assault conviction in New York, Jackson, 8 N.Y.3d at 870, and Calesha and Natoya both testified that petitioner had forcibly raped them. (T. 34-120, 133-186). Petitioner was not prejudiced by his trial counsel's failure to object to the prosecution's cross-examination because there was sufficient evidence to convict petitioner absent this alleged failure. See, Strickland, 466 U.S. at 695-696, 104 S.Ct. 2052.

Thus, petitioner has not demonstrated that the Appellate Division's decision is contrary to, or involved an unreasonable application of, the Strickland standard.[5] See, 28 U.S.C. §

---

[4] "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court . . . must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Strickland, 466 U.S. at 695-696, 104 S.Ct. 2052.

[5] Though both the federal and the New York ineffective assistance tests contain a prejudice component, "the touchstone of the New York test is 'the fairness of the process as a whole,' while the federal test considers the outcome of the proceeding for the defendant." Henry v. Poole, 409 F.3d 48, 69-70 (2d Cir. 2005) (citations omitted). Notwithstanding this difference,

2254(d). Nor has he demonstrated that the Appellate Division based its decision on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted with respect to petitioner's claim of ineffective assistance of trial counsel.

      H.     Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate counsel was ineffective for failing to raise "any legal arguments that would support the state and federal constitutional violations that occurred during [his] trial proceedings." Petition for Writ of Habeas Corpus at 27-42, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006) (alteration added). The Appellate Division found that petitioner failed to establish that his appellate counsel was ineffective. People v. Wright, 24 A.D.3d 576, 577, 805 N.Y.S.2d 296 (N.Y. App.Div. 2005).

Although the Supreme Court formulated the Strickland two (2)-prong test in the context of an ineffective assistance of trial counsel claim, the Second Circuit has applied the test to ineffective assistance of appellate counsel claims. Claudio v. Scully, 982 F.2d 798, 803 (2d Cir.1992). Effective assistance of counsel is "strongly presumed," and petitioner may rebut this presumption only by demonstrating that "in light of all the circumstances, the identified acts or

the Second Circuit maintains that the New York standard ("[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met." People v. Baldi, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981)) is not "contrary to" the Strickland standard for purposes of 28 U.S.C. § 2254(d)(1). Henry, 409 F.3d at 69-70; but see, Rice v. Senkowski, No. 9:04-CV-335, 2007 WL 2789504, at * 9 n.10 (N.D.N.Y. Sept. 24, 2007) (noting some recent tension between the federal standard for judging an attorney's performance under the Sixth Amendment and the prevailing test under New York law).

omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052. A petitioner may demonstrate this by showing that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark, 214 F.3d at 322 (citing Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)). However, a petitioner may not rebut the presumption of effective assistance by simply arguing that appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness. See, Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Appellate counsel is not required to "press nonfrivolous points," if counsel, as a matter of professional judgment, decides not to present those points. Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

The representation afforded petitioner by his appellate counsel did not fall below an objective standard of reasonableness under prevailing professional norms. See, Strickland, 466 U.S. at 689, 104 S.Ct. 2052; Jones, 463 U.S. at 751, 103 S.Ct. 3308. Petitioner fails to point to any unprofessional errors in the appellate brief or argument; rather, he repeats several times that his appellate counsel failed to investigate the facts of the case, and states vaguely that his appellate counsel "fail[ed] in presenting meritorious arguments" and "fail[ed] to bring an investigate a well-developed, clearly meritorious argument." Petition for Writ of Habeas Corpus at 29-43, Wright v. Rivera, No. CV-06-1725 (E.D.N.Y. appeal docketed Apr. 7, 2006). However, appellate counsel for petitioner accurately and adequately described the factual background of the case, raised seven (7) issues and the corresponding case law for each, and argued cogently for each of the seven (7) claims. See, Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); Jones, 463 U.S. at 751, 103 S.Ct. 3308.

Thus, petitioner has not demonstrated that the Appellate Division's decision is contrary

to, or involved an unreasonable application of, federal law. See, 28 U.S.C. § 2254(d). Nor has he demonstrated that the Appellate Division's decision was based on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted with respect to petitioner's claim of ineffective assistance of appellate counsel.

III.    Conclusion

Petitioner's petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also, Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: September 10, 2008
       Central Islip, New York

38

Copies to:

Oliver Wright, *pro se*
01A0455
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, New York 12051-0999

Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201